# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LEXINGTON INSURANCE COMPANY,** ) <br> **Plaintiff, and** ) <br> **Defendant-in-Counterclaim,** ) <br> ) <br> **v.** ) <br> ) <br> **UNITED HEALTH GROUP INCORPORATED** ) <br> **Defendant, and** ) <br> **Plaintiff-in-Counterclaim,** ) <br> ) <br> **and,** ) <br> ) <br> **UNITED HEALTHCARE SERVICES, INC.** ) <br> **UNITED HEALTHCARE INSURANCE CO.,** ) <br> **Plaintiffs-in-Counterclaim.** ) | **Civil Action No. 09cv10504-NG** |

**GERTNER, D.J.**

## AMENDED MEMORANDUM AND ORDER RE:
## MOTIONS FOR SUMMARY JUDGMENT
April 18, 2011

This dispute arises out of a series of malpractice insurance agreements.[1] United Health

Group ("United") had insurance policies with Lexington Insurance ("Lexington") and Executive

Risk Insurance, Inc. ("ERII").[2] United would cover its own claims up to $3 million per claim

(the self-insured retention mark or "SIR") and $42.5 million in the aggregate. Lexington would

---

[1] In the original version of this memorandum and order on summary judgment (document #182 ), the Court referred to these insurance agreements as "reinsurance" because United Health is an insurance company and reinsurance is the term for any insurance purchased by an insurer to insure its claims. In a conference on March 1, 2011, Lexington and United explained to the Court that reinsurance is not in fact the appropriate term because United did not purchase these policies in its capacity as an insurer. United went further, arguing that this misunderstanding went to the merits of the case. If only the Court had understood the relationship between the parties, United argued, it would have reached a different result on summary judgment. I invited United to file a motion to reconsider. Both parties have since exhaustively briefed this issue. (As I have said before, this case has been very well argued on both sides.) United's Motion to Reconsider (document # 190) is GRANTED, and this opinion is amended to address their concerns regarding the relationship of the parties as policy holder and primary insurer. As I explain, however, I do not come to a different conclusion on the merits.

[2] While once a defendant-in-counterclaim, ERII has since settled their case with Lexington and is no longer a party to this suit. See Notice of Settlement as to Executive Risk Indemnity, Inc. (document #178). Accordingly, its pending motion for summary judgment at document #117 is MOOT.

insure any claims over $3 million, up to a total of $30 million per claim and in the aggregate. And finally, ERII would insure any claims over and above $30 million. Claims rarely reached the Lexington threshold, and even more rarely reached the ERII threshold. Both insurers had the option to engage in and associate with the legal defense of claims that might reach their thresholds.

Lexington brought this suit against United for a declaratory judgment finding that it is not responsible for a $28 million claim[3] that arose out of <u>Physicians Health Plan, Inc. v. United Healthcare Serv., Inc.</u>, No. 01-CP-40-1860, 2002 WL 34452687 (S.C.Com.Pl. June 5, 2002), <u>aff'd sub nom</u>, <u>Carolina Care Plan, Inc. v. United Healthcare Serv., Inc.</u>, 361 S.C. 544 (2004) ("PHP claim"). Lexington alleges that it had no notice of the claim until shortly before settlement. United counter-claimed against Lexington for declaratory relief and breach of contract for failure to pay on the PHP claim as well as a separate and related lawsuit, <u>Sonoco Prod. Co. v. Physicians Health Plan, Inc.</u> ("Sonoco claim"). <u>See</u> United Answer & Countercl. 17-19 (document #10). United alleges that it had submitted these claims in accordance with the insurance policy as entries in "loss run reports" or "claim reports," Excel spreadsheets that included thousands of claims made to United.

This memorandum and order primarily addresses the parties' counter motions for summary judgment. The parties have bifurcated discovery such that they submit only the threshold issue of notice to summary judgment. They ask the Court to decide whether Lexington had substantial notice of the PHP claim, and if not, whether it was prejudiced as a result. After a

---

[3] The parties appear to disagree as to the exact amount of the claim, but a letter from United to Lexington in April of 2008 asks for reimbursement of $19.7 million in legal expenses and $8.5 million to cover the settlement. <u>See</u> Letter from Marilyn Nevin to Lexington, Apr. 22, 2008 ("Nevin Letter"), Pl.'s Statement of Facts ("Pl.'s St. Facts"), Ex. K (document #127-1).

hearing, I **GRANT** Lexington's Motion for Summary Judgment (document #125); and I **DENY** United's Motion for Summary Judgment (document #119).

## I.     BACKGROUND

### A.     United's Insurance Policy with Lexington (document #127-1)

Lexington issued Managed Care Professional Liability Policy No. 647-7018 ("Lexington Policy") to United for the policy period from December 1, 2000 to December 1, 2001.  The Policy was extended by endorsement to May 1, 2002.  Under the Lexington Policy, United self-insured its claims up to $3 million per claim and $42.5 million in the aggregate.  Lexington covered up to $30 million per claim and up to $30 million in the aggregate over and above the SIR.  Defense costs were included within the limits of the liability.  Lexington Policy, Pl.'s Statement of Facts ("Pl.'s St. Facts"), Ex. A §§ 8.1-8.7 (document #127-1) (hereinafter Lexington Policy).

The original policy was drafted by United and negotiated by the parties.  It includes, inter alia, the following provisions:

> **§ 1.0 Introduction**
>
> **Important Note:** This is a **claims** made insuring agreement in which **defense costs** are included in the limits.  **Claims** or **suits** must be reported in writing during the **policy period** or during an Optional Reporting Period Extension consistent with the reporting methodology described in Section 5.4 of this policy . . . .
>
> **§ 2.9 Service of Suit**
>
> Any notice given or required pursuant to this Agreement to Lexington shall be made in writing . . . .
>
> Any such notices shall be sent to the respective parties as follows: . . . .

To the Company:

Lexington Insurance Company
Counsel, Legal Department
Lexington Insurance Company
200 State Street
Boston, MA 02109

. . . .

## § 2.11 Service of Suit

Except as otherwise noted in the policy, Minnesota law will apply in issues concerning interpretation of coverage under this policy . . . .

## § 4.6 Defense Costs . . . . Defense and Settlement

With respect to any **claim** or **suit** payable hereunder in excess of the **Self-Insured Retention** [$3mill.], or covered hereunder and payable by the **Insured** under its **Self-Insured Retention**:

a.   The **Company** [Lexington] shall not be called upon to assume charge of the investigation, **defense** or **settlement**, of any **claim** made or **suit** brought against the **Insured**, but the **Company**, at its option, shall have the right and be given the opportunity to associate, at its own expense, with the **Insured**, in the investigation, defense or control of such **claim** or **suit**, when such action would exceed or appear reasonably likely to exceed such **Self-Insured Retention**.

b.   The **Insured** shall arrange for and assume the investigation, **defense** and **settlement** of each **claim** or **suit** provided that the **Insured** shall make no action or settlement which alone or together with **Claim Expenses** will exceed the **Self-Insured Retention** without the consent of the **Company**, which consent will not be unreasonably withheld.

c.   The **Company** shall advance **defense costs** as incurred, subject to the applicable **Self-Insured Retention**. The **Protected Person** agrees to repay such **Defense Costs** to the **Company** in the event and to the extent it is ultimately determined that such **Protected Person** is not entitled to payment of such **Defense Costs** under this policy.

## § 5.3 Notification of Claims

You agree to notify us as soon as practicable of all incidents, **claims** or **suits** in which any **claim** you reserve at or in excess of 50% of your **Self-Insured Retention** for that **claim**. In addition, you agree to send us quarterly **claim** reports indicating date of loss, date reported to you, claimant's name, description of **claim** and reserve amount. The quarterly claim reports should be sent to:.

Lexington Insurance Company
Claim Department
200 State Street
Boston, Massachusetts 02109

By accepting the quarterly claim reports, we do not agree that the losses or potential losses detailed therein are covered by this agreement. All reported items remain subject to the conditions of coverage sections of the policy and we have the right to contest coverage upon identification of a coverage issue.

. . . .

**§ 8.5 Self-Insured Retention**

Your **Self-Insured Retention** applies to both **Damages** and **Claim Expenses** and *you agree that you will not, except at your own expense, assume any obligation above your **Self-Insured Retention***.

. . . .

We [Lexington] will pay **Damages** and **Claim Expenses** for all covered **claims** or **suits** in excess of your **Self-Insured Retention** up to the Limits of Liability shown in the Declaration.

Lexington Policy (bold emphasis in original; italicized emphasis added).

**B.     Underlying Litigations**

On May 10, 2001, the PHP claim was filed against United and certain of its affiliates and employees in Richland, South Carolina. The PHP complaint alleged that United breached its contractual and fiduciary duties to PHP, improperly withheld financial information, and failed to properly account for PHP funds. The complaint further alleged breach of covenant of good faith

and fair dealing, violations of the South Carolina Unfair Trade Practices Act, civil conspiracy, fraudulent concealment, negligence, tortious interference, conversion, equitable indemnification, equitable accounting, and right to a constructive trust. PHP Compl., Pl.'s St. Facts, Ex. E (document #127-1). When the suit was later submitted to arbitration, PHP demanded $152 million. Pl.'s St. Facts ¶ 22 (document #127).

The details of the underlying PHP litigation are disputed -- and some are not provided to the court -- but United by all accounts launched a vigorous defense. The action was litigated in court, mediation and arbitration for seven years, from May 10, 2001 to May 6, 2008. Pl.'s St. Facts ¶ 24. Upon receipt of the complaint, United filed a motion with the trial court in South Carolina to compel arbitration in June of 2002. <u>See</u> Timeline of Litigation, Def.'s Statement of Facts ("Def.'s St. Facts"), Ex. A (document #121-1). The motion was granted, and PHP appealed. United defended on appeal until the Supreme Court of South Carolina upheld the order in October of 2004. <u>Id.</u> Arbitration finally began in March of 2005, and the parties conducted discovery. <u>Id.</u> In 2007, PHP and United stayed the arbitration to mediate the claim, and mediation failed. The parties finally settled on May 5, 2008. <u>Id.</u>

On April 22, 2008, Marilyn Nevin, United's Vice President of Risk Management, forwarded a formal overnight letter to Lexington advising that it planned to settle the case for $8.5 million and that United had incurred $19.7 million in legal expenses. The letter requested that Lexington reimburse United for these costs to the extent that they exceeded United's SIR. <u>See</u> Letter from Marilyn Nevin to Lexington, Apr. 22, 2008 ("Nevin Letter"), Pl.'s St. Facts, Ex. K (document #127-1). Lexington alleges that this was the first it had heard of the claim, much

less the litigation.  Pl.'s St. Facts ¶ 29 (document #127).[4]

### C. Loss Run Reports

United, however, had submitted the PHP claim as one line item of thousands in loss run reports to Lexington.  United sent Lexington at least forty-two "claim reports" or "loss run reports" in which the PHP claim was listed.  Def.'s St. Facts ¶ 34-44 (document #121).  At least five of the reports showed that United's reserve for the PHP Action had reached or exceeded the $1.5 million, or the 50% of United's Self-Insured Retention mark.  Id. ¶¶ 50-57.  Lexington never inquired further about the claim.

The last two of these reports (April 28 and May 31, 2006) had the PHP Action listed at a zero for reserve expenses.  According to the line item, only $1,678,315.71 had been spent on the claim to date and United expected to spend no additional funds.  See Pl.'s St. Facts ¶ 33; United Health Group, Lexington Loss Run, Apr. 28, 2006 ("Apr. 28, 2006 Loss Run"), Def.'s St. Facts, Ex. D-24 (document #121-1).  In fact, on those dates United had received defense bills for $1,976,692 and $2,318,743 respectively.  Pl.'s St. Facts ¶ 35.  United explains this discrepancy by noting that there is a lag time between the payment of claims and the update of the claim report spreadsheets.

United stopped sending claim reports to Lexington after May 31, 2006, and did not

---

[4] To support its allegations regarding the correspondence exchanged between the two parties, Lexington submitted an affidavit by Attorney Tamara S. Holtslag, its principal counsel in this litigation, as an attachment to its Statement of Facts.  See Holtslag Aff., Pl.'s St. Facts, Ex. P (document #127-1).  United filed a Motion to Strike Attorney Holtslag's Affidavit (document #140) on the grounds that Attorney Holtslag violated Rule 3.7 of the Massachusetts Rules of Professional Conduct, which provides: "[A] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness."  Mass. R. Prof. C. 3.7.  I DENY United's Motion to Strike.  I find that Attorney Holtslag is not a necessary witness within the meaning of Rule 3.7 because the content of her affidavit is merely cumulative, the facts are easily obtainable elsewhere, and because it is clear that the affidavit was submitted as "a ready and economical vehicle to expedite the disposition of [the] motio[n] for summary judgment."  Hallmark Dev., Inc. v. Fulton, 2004 WL 5492706, at *9 (N.D.Ga. 2004); see also Carta v. Lumbermens Mut. Cas. Co., 419 F. Supp. 2d 23, 29 (D. Mass. 2006) (quoting Merrill Lynch Bus. Fin. Serv., Inc. v. Nudell, 239 F. Supp. 2d 1170, 1173 (D. Colo. 2003)).

resume until April of 2008, after the PHP claim was settled.  Id. ¶ 36.  United explains that it sent

the claim reports to Lexington's affiliate during that time period.  United had opened a new

account with a Lexington affiliate around that time and sent it claim reports that included not

only claims under the new account, but all of the claims against it, including PHP.  See id. ¶ 37.[5]

## II. **STANDARDS**

Summary judgment is appropriate only where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

party seeking summary judgment has the burden to establish the lack of a genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to consider

the facts in the light most favorable to the non-moving party.  Where the court is faced with

cross-motions for summary judgment, the court is to "consider each motion separately, drawing

inferences against each movant in turn."  Reich v. Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir.

1997).  This "Janus-like" approach often results in the denial of both motions.  Allstate Ins. Co.

v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998).  Here, however, the underlying facts are

not disputed and thus do not force a dual denial.  Id.

The parties agree that Minnesota law governs the insurance polices at issue in accordance

with a choice of law provision within the Lexington Policy.  See Lexington Policy, Pl.'s St.

Facts, Ex. A § 2.11.  See also Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16,

20 (1st Cir. 2003) ("Where parties have agreed to the choice of law, this court is free to forego an

_____

[5] I should note that the parties submitted evidence as to the practice and purpose of loss run reports in the industry as part of their motions on summary judgment.  And indeed in their motion to reconsider United again brings extrinsic evidence concerning how Lexington treated the loss run reports.  As I will explain, I find the contract to be unambiguous and therefore may not consider extrinsic evidence.  See Blattner v. Forster, 322 N.W. 2d 319, 321 (Minn. 1982) (the court may consider extrinsic evidence where the plain language of the contract is ambiguous).  I therefore do not include it here.

independent analysis and accept the parties' agreement.").  Under Minnesota law, the interpretation of insurance polices is generally a matter of law for the court.  Watson v. United Servs. Auto Ass'n, 566 N.W.2d 683, 688 (Minn. 1997).

General contract interpretation principles apply.  The contract is to be construed as a whole, and all of the terms must be given effect to the extent possible.  Haarstad v. Graff, 517 N.W.2d 582, 584 (Minn. 1994); Bobich v. Oja, 258 Minn. 287, 295 (1960).  I am to determine the "usual and accepted meaning" of the contract's terms so as to give effect to the parties' intent.  Progressive Specialty Ins. Co. v. Widness ex rel. Widness, 635 N.W.2d 6, 8 (Minn. 2001).  To determine the plain meaning, I am to ask what a "reasonable person" in the insured's position would have understood the language to mean.  Canadian Universal Ins. Co. v. Fire Watch, Inc., 258 N.W.2d 570, 572 (Minn. 1977).

The question of whether an insurance policy is ambiguous is a matter of law for the court.  Columbia Heights Motors Inc. v. Allstate Ins. Co., 275 N.W.2d 32, 34 (Minn. 1979).  A policy is ambiguous if it is "reasonably susceptible of more than one interpretation."  Current Tech. Concepts, Inc. v. Irie Enter., Inc., 530 N.W.2d 539, 543 (Minn. 1995).  Two competing principles apply to the interpretation: I) As a general rule, ambiguous language is to be construed against the drafter, id.; and ii) in insurance policies, ambiguity is generally to be construed in favor of the insured.  See Hubred v. Control Data Corp., 442 N.W.2d 308, 310 (Minn. 1989).

The latter does not apply here.  The doctrine of *contra proferentem* favors coverage for those insured who have limited bargaining power and fall prey to the large insurance companies who drafted their policies.  See Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co., 366 N.W.2d 271, 277 (Minn. 1985) ("Where there is unequal bargaining power between the parties so that

one party controls all of the terms and offers the contract on a take-it-or-leave-it basis, the contract will be strictly construed against the party who drafted it.").  See also Haarstad, 517 N.W.2d at 584 ("A policy should be construed as a whole with all doubts concerning the meaning of language employed to be resolved in favor of the insured.") (quoting Fire Watch, 258 N.W.2d at 572).  In this case, however, United is not an innocent consumer but rather a sophisticated insurance company who negotiated, and indeed drafted, the terms of their policy.[6] See generally United Health Group Inc. v. Columbia Cas. Co., 2010 WL 317521, at *3 (D. Minn. 2010) (declining to apply the contra proferentem rule where "two large corporations -- neither of which, as far as the record reflects, had superior bargaining power -- painstakingly negotiated a unique insurance policy with the assistance of experienced counsel.").

And where the language of the policy is clear and unambiguous, I may determine the meaning of the contract on summary judgment.  Denelsbeck v. Wells Fargo & Co., 666 N.W. 2d 339, 346 (Minn. 2003).

## III.    ANALYSIS

To prevail at trial to avoid payment of the PHP claim under the Policies, Lexington would have to prove (1) that it had no notice of the claim; and (2) that it was actually prejudiced

---

[6] United argues in its motion to reconsider that their status as an insurance company is irrelevant, since they were not acting as an insurer when they purchased the policy.  This argument is not compelling.  United is a sophisticated party who indeed is well-versed in insurance policy and practice precisely because it is an insurer itself. And in fact United wrote the policy in question.

as a result.  See Reliance Ins. Co. v. St. Paul Ins. Companies, 307 Minn. 338, 342 (Minn. 1976).[7]

I will consider each question in turn.

## A.      Notice Requirement

Late notice by an insured will defeat coverage where the insured is prejudiced as a result. Reliance, 307 Minn. at 342.  Here, Lexington argues that it did not receive notice of the underlying PHP litigation until the case was about to be settled.  Lexington claims it first learned of the claim when Marilyn Nevin, United's Vice President of Risk Management, sent Lexington a letter on April 22, 2008 notifying that United had incurred $19.7 million in legal expenses and planned to settle the PHP action for $8.5 million.  The letter requested that Lexington reimburse United for these costs to the extent that they exceeded United's SIR.  See Nevin Letter, Pl.'s St. Facts, Ex. K.

United has produced evidence that it submitted loss run reports to Lexington that included the PHP action as one of thousands.  It was the responsibility of Lexington, the defendant argues, to inquire about the particular claim; and any ignorance of the facts is its own responsibility.  This argument raises two questions: (I) whether loss run reports can serve as proper notice under this insurance policy; and (ii) if they can, whether these particular loss run

---

[7] There is indeed a judicial policy in Minnesota that protects the insured from forfeiture of insurance benefits.  In their motion to reconsider, United calls this policy the "Anti-Forfeiture Doctrine;" Lexington counters that United coined the term.  Whatever it is called, Minnesota courts certainly seek to protect the insured from forfeiture.  See, e.g., Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co., 615 N.W.2d 341, 344, 349 (Minn. 2000) (noting Minnesota's "long-standing judicial policy disfavoring forfeitures in insurance contracts"); Am. Family Mut. Ins. Co. v. Baumann, 459 N.W.2d 923, 926-27 (Minn. 1990) ("Historically this court has exhibited considerable reluctance to declare a forfeiture of insurance benefits as a consequence of the insured's breach of the policy provisions absent a showing that the insurer has been prejudiced thereby.").  Indeed, to protect the insured, Minnesota courts have held that an insurance company who seeks to avoid payment on a claim for failure to provide notice must show that it received no substantial notice of the claim and that it was prejudiced as a result.  Forfeiture will therefore be allowed in only rare instances.  As I will explain, this unique case -- involving an insurance contract between two very sophisticated parties and a 28 million dollar claim -- is such an instance.

reports -- with intermittent delivery and inaccurate or incomplete information -- constituted notice in this case.

### 1.    Loss run reports could satisfy the notice requirement

Under Minnesota law, notice requirements are considered reasonable to provide the insurer with the opportunity investigate claims promptly, protect itself against fraudulent claims, and prevent exorbitant costs.  <u>See generally</u> <u>Reliance</u>, 307 Minn. at 342; <u>Sterling State Bank v. Virginia Sur. Co.</u>, 285 Minn. 348, 354 (1969) ("It is only reasonable to require that the insurer be given an opportunity for prompt investigation so as to protect itself against fraudulent or exorbitant claims and, while the matter is fresh in the minds of all, to appraise and determine a disposition by way of settlement or defense.").  On the other hand, the Supreme Court of Minnesota has held that the fact of notification is more important than the form.  <u>Id.</u> at 353.  The law requires only "substantial compliance."  <u>Id.</u> at 348.  The question here, then, is whether the loss run reports were "substantial notice" of the claim.

I am to evaluate the terms of the policies according to their plain meaning.  <u>Progressive Specialty</u>, 635 N.W.2d at 8.  Consider the language of the Lexington Policy:

**§ 5.3 Notification of Claims**

You agree to notify us as soon as practicable of all incidents, **claims** or **suits** in which any **claim** you reserve at or in excess of 50% of your **Self-Insured Retention** for that **claim**.  In addition, you agree to send us quarterly **claim** reports indicating date of loss, date reported to you, claimant's name, description of **claim** and reserve amount.  The quarterly claim reports should be sent to:.

Lexington Insurance Company
Claim Department
200 State Street
Boston, Massachusetts 02109

> By accepting the quarterly claim reports, we do not agree that the losses or potential losses detailed therein are covered by this agreement. All reported items remain subject to the conditions of coverage sections of the policy and we have the right to contest coverage upon identification of a coverage issue.

Both parties argue that these terms are clear and unambiguous, although -- ironically to be sure -- they reach different conclusions about their meaning. Lexington maintains that a loss run report cannot constitute notice of a claim. The policy requires United to notify it of "incidents, claims or suits [United] reserve[s] at or in excess of 50%" of the SIR Retention for that claim. It requires, in other words, that United notify Lexington when claims are likely to reach the $3 million threshold. And Lexington notes that "in addition," United must send quarterly claim reports (or loss run reports) of *all* their claims. See Carlson Mktg. Grp., Inc. v. Royal Indem. Co., 517 F. Supp. 2d 1089, 1115-16 (D. Minn. 2007) (finding that "in addition to" means on top of the previous clause). According to Lexington, the claim reports are a separate and distinct requirement under the Policy and therefore cannot serve as notice of the large claims that are at issue in the first requirement.

United, however, argues that if Lexington had specific requirements for notice, it could have included them in the contract. It could have, for example, insisted that notice be individual or that notice be made by letter or in writing. Instead, the notice provision provides only that United notify Lexington "as soon as practicable of all incidents." It could not be more broad, United argues. As a sophisticated insurer, Lexington had the language tools to include very specific notice requirements into the contract and chose not to do so. I agree.

Indeed, the notice requirement here is very broad. I interpret the provision – according to its plain terms -- to have two clear requirements: (I) that notice be made of claims that would

exceed the threshold SIR; and (ii) that loss run reports be sent periodically. In other words, the contract requires both initial notice (in any form) and ongoing notice (in the form of a loss run report). There is nothing to suggest that a loss run report could not also satisfy the first requirement of initial notice; I will not read additional requirements into the language.

It is significant that the requirement of loss run reports is included in the "Notice Provision" of the contract. Loss run reports are -- according to the structure of the policy -- *part* of the notice of claims.

Looking at the contract as a whole places the purpose of notice in context. For example,

> **§ 4.6 Defense and Settlement**[8] notes:
>
> With respect to any **claim** or **suit** payable hereunder in excess of the **Self-Insured Retention** [$3mill.], or covered hereunder and payable by the **Insured** under its **Self-Insured Retention**:
>
> a.     The **Company** [Lexington] shall not be called upon to assume charge of the investigation, **defense** or **settlement**, of any **claim** made or **suit** brought against the **Insured**, *but the **Company**, at its option, shall have the right and be given the opportunity to associate, at its own expense, with the **Insured**, in the investigation, defense or control of such **claim** or **suit**, when such action would exceed or appear reasonably likely to exceed such **Self-Insured Retention**.*

Lexington Policy (bold emphasis in original; italicized emphasis added). This provision suggests that the purpose of the notice is to allow Lexington to associate with the insured in the investigation or defense of those claims in which it has an interest -- or those claims for which they are likely to be responsible.

---

[8] United argues that I should not consider this section because I am limited to the question of notice in this first phase of the litigation. I include § 4.6 here because it is relevant to the notice provisions. A contract must be read as a whole; this section informs my analysis of § 5.3.

To be sure, a loss run report is not the best notice of an individual claim that reaches half of the $3 million SIR, but neither is it prohibited, according to the broad language of the policy. An accurate loss run report could theoretically put Lexington on notice of a large claim, thus satisfying the first requirement of § 5.3 for *initial* notice. And there is no question that loss run reports meet the second requirement for *ongoing* notice. Quarterly claim reports keep Lexington appraised of the status of individual claims and their likelihood to escalate, as well as the status of the overall aggregate. Under the circumstances then, § 5.3 and the purpose of the notice requirement in the contract lead to the conclusion that loss run reports could serve as proper notice of claims under the Policy.

### 2. These loss run reports did not serve as proper notice under § 5.3

The second question, however, is even if loss run reports *could* constitute notice, whether the particular loss run reports here provided substantial notice of the claim. In this case, the loss run reports included thousands of claims, few of which would ever reach Lexington's threshold. See Steadfast Ins. Co. v. Sentinel Real Estate Corp., 283 A.D.2d 44, 53 (N.Y. App. Div. 2001) ("[T]he fact that the report lists hundreds of claims, most of which were not going to reach the SIR limit, and, therefore, would never become the insurer's responsibility, makes the report entirely unsuitable to be deemed to satisfy the notice condition" of an insurance contract.). But more significantly, the notice was wrong or incomplete in important respects.

United included the claim as a line item in its loss run report on July 16, 2001, a mere two months after the PHP litigation arose. Indeed, this notice was made "as soon as practicable" as required for initial notice under § 5.3. And in fact, United continued to include the claim on more than forty additional reports. The last two of these reports (Apr. 28 and May 31, 2006),

however, had the PHP Action listed at a zero reserve. In other words, the line item suggested that United expected to spend no additional funds on this claim. According to the line item in both reports, only $1,678,315 had been spent on the claim to date. Pl.'s St. Facts ¶ 33. On those dates, however, United had actually received defense bills for $1,976,692 and $2,318,743, respectively. Id. ¶ 35. And of course, the fees were continuing to mount. See id. ¶ 39. United explains that there is a lag time between the payment of claims and the update of the claim report spreadsheets. Whatever the reason, the last report provided to Lexington suggested that the claim had been paid in full and gave no indication that it would exceed the $3 million threshold. Moreover, United stopped sending claim reports to Lexington after May 31, 2006 and did not resume until April of 2008, after the PHP claim was settled.[9]

This lapse had extraordinary consequences to Lexington. In May of 2006, United notified Lexington that the claim was settled at $1.7 million. And two years later in April of 2008, United demanded that Lexington pay a $28.2 million bill. There was no communication about the claim -- loss run or otherwise -- in the interim, a clear violation of the ongoing notice

---

[9] United sent loss run reports to an affiliate of Lexington during those years, which included the PHP claim. I will not, as United suggests, consider reports to an affiliate to be proper notice to Lexington. The Notice Provision specifically required that loss run reports be sent to Lexington Insurance Company, Claim Department, 200 State Street, Boston, Massachusetts 02109.

requirement of § 5.3.[10]  Lexington never had the opportunity to associate in the litigation -- the

purpose of ongoing notice through loss run reports -- until the case was about to be settled.[11]

I therefore GRANT summary judgment to Lexington and hold that United did not

provide substantial notice of the PHP claim; and I DENY summary judgment to United on this

same question.

## B.    Prejudice

To avoid payment on the insurance claim, however, Lexington must prove not only that it

had no timely notice of the claim *but also that it was actually prejudiced by the delay of notice*.

Reliance, 307 Minn. at 343.  "The burden of proving prejudice is on the insurer claiming

prejudice."  North Star Mut. Ins. Co. v. Midwest Family Mut. Ins. Co., 634 N.W.2d 216, 220

(Minn. Ct. App. 2001) (citing Reliance, 307 Minn. at 343).  It is unequivocally true that

Lexington did not participate in the defense of the PHP action as it was entitled at its election.

The question is whether the evidence suggests that the failure of notice of what amounted to

massive complex litigation, spanning seven years and various forums, so clearly prejudiced

Lexington as to require summary judgment as a matter of law.

---

[10] It is true, as I have said, that Minnesota law requires only substantial notice of the claim.  See, e.g. St. Paul Fire & Marine Ins. Co. v. Metro Urology Clinic, P.A., 537 N.W.2d 297, 300 (Minn. App. 1995).  In St. Paul Fire & Marine Ins. Co., for example, the Appeals Court found that an insured had provided substantial notice of a claim by a phone call, even though he did not provide the injured party's address, the names and addresses of witnesses, or the date, time, and place of incident.  Id.  The district court reasoned, and the Appeals Court agreed, that St. Paul had an obligation to notify the caller of any defect in the notice.  St. Paul could have asked for those names and addresses.  In the instant case, however, there was no phone call, e-mail, conversation, or any other form of communication about the PHP claim from May of 2006 to April of 2008.  Unlike St. Paul, Lexington was not aware of any defect in notice of the PHP claim, as it was not aware that the PHP litigation continued at all.  It had every indication that the litigation had come to an end.

[11] Let me be clear: I find that that loss run reports *can* constitute notice under the Policy.  And even in this instance, the first loss run report listing the PHP claim provided initial notice of the claim.  I have explained, however, that the Lexington Policy clearly requires more than initial notice.  I find that the loss run reports provided to Lexington -- or in this case *not* provided to Lexington -- did not provide the *ongoing* notice required under the Policy.  This is not, as United suggests on reconsideration, a mere technicality.  United did not send loss run reports, call, e-mail, discuss, or mention the claim during those years that it escalated from $1.5 to 28 million.  United's briefs on reconsideration fail to grapple with the failure to provide substantial ongoing notice of the claim.

To be sure, it is not enough for Lexington to argue that it was prejudiced because the claim was not reported for seven years. Under Minnesota law, *time* is not the crucial factor in a prejudice analysis. <u>Reliance</u>, 307 Minn. at 343. The question is what happened during the time between the moment the claim arose and the moment the claim was noticed to the insurer. Likewise, the fact that a case has settled or is nearing settlement is also not necessarily enough to establish prejudice. <u>See, e.g.</u>, <u>North Star</u>, 634 N.W.2d at 221-22. In <u>North Star</u>, the Court of Appeals held that the fact that an insured settled his claim before providing notice to his insurer did not necessarily prejudice the insurer as a matter of law. <u>Id.</u> at 221. <u>North Star</u> involved accident insurance, and the underlying accident at issue in that case, the court reasoned, was "not complicated." <u>Id.</u> Similarly, in <u>Dairyland Ins. Co. v. Clementson</u>, the Court of Appeals reversed the trial court's finding of prejudice per se where the insured failed to notify the insurer until she had already settled for losses in an automobile accident. 431 N.W.2d 895, 898 (Minn. Ct. App. 1988). The Court noted that there was no evidence that the underlying case was disputed or that any other driver was responsible for the accident. <u>But see</u> <u>Noon Realty, Inc. v. Aetna Ins. Co.</u>, 387 N.W.2d 465 (Minn. Ct. App. 1986) (finding as a matter of law that seven-year delay in notice of suit to insurer was prejudicial to insurer where insurer had no opportunity to investigate and was later called upon to defend).

Unlike <u>Dairyland</u> or <u>North Star</u>, however, the underlying litigation in this case was disputed, and indeed exceedingly complex. From the time that the PHP claim arose, United litigated the action in court, mediation and arbitration. <u>See</u> Timeline of Litigation, Def.'s St. Facts, Ex. A. United successfully moved the South Carolina trial court to compel arbitration in June of 2002. PHP appealed the trial court's order, and United defended on appeal to the South

Carolina Supreme Court. Arbitration finally began in March of 2005, and the parties engaged in discovery. In 2007, PHP and United mediated the claim, and mediation failed. The PHP action was not resolved until the parties signed a settlement agreement for $8.5 million and filed a stipulation of dismissal in the South Carolina court on May 6, 2008. Def.'s St. Facts ¶¶ 32-33. Over the course of these seven years, United enlisted three different law firms in its defense and incurred upwards of $21 million in legal fees.[12] The parties identified seventy witnesses and conducted at least thirty depositions. Pl.'s St. Facts ¶ 23.

During this time, United gave no indication to Lexington that the litigation was pending, provided no documents about the action, and failed to consult Lexington until it sent a letter requesting approval of the final settlement on April 22, 2008. If the purpose of the notice requirement is to allow Lexington to associate in claims that reach its threshold, there is no question that Lexington had no opportunity to associate throughout years of shifting law firms, escalating legal fees, mediation, arbitration, settlement discussions, and ongoing communications between counsel. Ultimately, after it was said and done, all that Lexington was asked to do was to foot the bill. I find that according to these particular facts -- involving a multi-million dollar litigation that is so uniquely complex -- Lexington was prejudiced as a matter of law.[13] See, e.g., Safety Mut. Cas. Corp. v. Liberty Mut. Ins. Co., 959 F.2d 230 (1st Cir.

---

[12] The exact amount of fees appears to be in dispute, but the parties agree that United spent more than $19 million litigating the claim. United argues at reconsideration that the amount of legal fees is irrelevant. I disagree. This was a professional liability insurance policy, so the underlying claims involved lawsuits. Legal fees by definition are part and parcel of these claims. And here, where Lexington had the right to associate in the defense of the PHP claim and to participate in the litigation, it could have participated in decisions such as choice of law firms, choice of forum, and how to weigh the cost of ongoing litigation versus the cost of settlement -- all factors that affect legal fees. It is indeed significant that the cost of the legal fees ($19 million) far surpassed the cost of settlement ($8.5 million) in this case.

[13] Note that I do not find that a delay of notice until settlement is prejudice per se – I hold only that Lexington was prejudiced in this particular set of extreme circumstances.

1992) (holding that an insurance company was prejudiced as a matter of law when its insured, an insurance company itself, failed to notify it of a claim before a $2.5 million jury verdict).[14] No reasonable juror could reach a different conclusion.

United argues that Lexington should be required to produce specific evidence to prove that the outcome of the litigation or settlement would have been different had they contributed to the defense.[15] It asks essentially that Lexington re-litigate a multi-million dollar complex lawsuit before it could avoid payment on the original suit. The position is absurd and particularly so here, where United has refused to disclose the details and documents of the underlying litigation to Lexington. Under the circumstances, Lexington could not possibly meet such a standard.[16] Since I find that Lexington was prejudiced as a matter of law, I need not address Lexington's Motion to Compel and Objections to the Magistrate Order (document #177).

I pause here to note that United attempts to have its cake and eat it too by claiming attorney-client privilege to the documents regarding the PHP claim. These documents were

---

[14] Upon reconsideration, United challenges my "reliance" on Safety Mut.. To be sure, Safety Mut. is an unpublished First Circuit case applying Massachusetts law. It was cited by Lexington upon summary judgment and argued then by both parties. I cite it here because it is one of the few cases on notice/prejudice that involves underlying litigation that is relatively complex. I find the reasoning persuasive in the instant context. The case before me involves an underlying claim for a 28 million dollar litigation that spanned seven years and three forums. As far as I know, no Minnesota court has addressed the question of prejudice in these circumstances.

[15] It is true that the prejudice standard is rigorous, as United reiterates upon reconsideration, but it cannot be so rigorous that it is impossible to prove. United essentially asks me to impose a "but/for" standard: but for the delay in notice, Lexington would have avoided liability. Such a test would negate the prejudice analysis altogether by imposing a nearly unattainable standard. See Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co., 187 F.3d 871, 875 (8th Cir. 1999) (That an insurer shows the "certainty of substantial litigation expense" is enough to establish prejudice) (applying Minnesota law); and W. Bay Exploration Co. v. AIG Specialty Agencies, Inc., 915 F.2d 1030, 1036 (6th Cir. 1990) ("Prejudice will be found where the delay 'materially' impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party.") (applying Michigan law).

[16] It is my understanding that United has provided three hundred original court pleadings but not the underlying attorney product that is the backbone of litigation strategy.

*never* privileged vis a vis Lexington; had Lexington elected to "associate" with the underlying litigation, it would clearly have had access.

Accordingly, I GRANT summary judgment to Lexington and find that Lexington was prejudiced as a matter of law by the delay in notice. I DENY summary judgment to United.

IV.    <u>**CONCLUSION**</u>

For the reasons stated above:

1.    I **GRANT** Lexington's Motion for Summary Judgment (**document #125**);

2.    I **DENY** United's Motion for Summary Judgment (**document #119**); and

3.    I **DENY** Defendant's Motion to Strike Attorney Holtslag's Affidavit (**document #140**).

4.    Plaintiff's Objections to the Magistrate Order (**document #177**) are **MOOT**.

The parties are to provide a form of judgment by **April 25, 2011.**

**SO ORDERED.**

**Date: April 18, 2011**            */s/ Nancy Gertner*

                     **NANCY GERTNER, U.S.D.J.**